**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MARIO ORTEGA, | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| vs. | ) | Case No. 4:18 CV 1576 DDN |
| | ) | |
| CITY OF ST. LOUIS, et al., | ) | |
| | ) | |
| Defendant(s). | ) | |

**MEMORANDUM AND ORDER**

This action is before the Court on defendants' Motion to Dismiss (Doc. 106) plaintiff's Third Amended Complaint (Doc. 104). The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the motion to dismiss is sustained in part and otherwise denied.

I.      **BACKGROUND**

In 2018, plaintiff Mario Ortega, Ph.D., commenced this action after the St. Louis Metropolitan Police Department ("SLMPD") arrested him and others on September 17, 2017. Plaintiff twice-amended his complaint and the parties engaged in extensive discovery to identify unnamed Doe defendants. His current, Third Amended Complaint alleges various claims under 42 U.S.C. § 1983 (Counts 1, 2, 3, 4, 12, and 13) and under Missouri state law (Counts 5, 6, 7, 8, 9, 10, 11, and 14). At the conclusion of this discovery, plaintiff filed his Third Amended Complaint and defendants moved to dismiss. Plaintiff asserts the stated claims in the following Counts in his Third Amended Complaint:

> Count 1:      Unreasonable seizure under the Fourth and Fourteenth Amendments against the defendant officers[1];

---

[1] The Third Amended Complaint defines "defendant officers" as defendants Lt. Col. Gerald Leyshock; Lts. Timothy Sachs, Scott Boyher, and Bill Kiphart; Major Daniel Howard; Sergeants Randy Jemerson, Brian Rossomanno, and Matthew Karnowski; and Officers Stephen Walsh, Matthew Burle, and Jarred Thacker. (Doc. 104 at 1 n. 1; ¶¶ 12-20.)

Count 2:      Violations of free speech, press, association, and assembly under the First and Fourteenth Amendments against the defendant officers;

Count 3:      Conspiracy to violate civil rights against the defendant officers and defendant Lt. Col. Lawrence O'Toole;

Count 4:      Failure to train, discipline, and supervise, and an unconstitutional custom of unconstitutional seizures and using excessive force against defendant City of St. Louis;

Count 5:      Assault against the defendant officers;

Count 6:      False arrest against the defendant officers;

Count 7:      Abuse of process against the defendant officers and defendant Lt. Col. Lawrence O'Toole;

Count 8:      Malicious prosecution against the defendant officers and defendant O'Toole;

Count 9:      Intentional infliction of emotional distress against the defendant officers;

Count 10:     Negligent infliction of emotional distress against the defendant officers;

Count 11:     Vicarious liability under the City of St. Louis Charter against defendants O'Toole and Charlene Deeken, Director of Public Safety for the City of St. Louis;

Count 12:     Excessive force under the Fourth and Fourteenth Amendments against the defendant officers;

Count 13:     Failure to intervene in the use of excessive force against the defendant officers and defendant O'Toole; and

Count 14:     Battery against defendant officers.

Defendants seek to dismiss the Third Amended Complaint for several reasons including the failure to state a claim upon which relief can be granted.  The individual defendants also assert they are entitled to qualified immunity on the counts asserting violations of § 1983 and to official immunity for the state law claims.

For purposes of this Motion to Dismiss, the Court must accept as true the following facts as alleged in the Third Amended Complaint.  *Great Rivers Habitat All. v. Fed.  Emergency Mgmt. Agency*, 615 F.3d 958, 988 (8th Cir. 2010).

2

In September 2017, after a bench trial, a Missouri Circuit Court judge acquitted then-police officer Jason Stockley of the charge of first-degree murder of Anthony Lamar Smith.  In response, public protests took place in St. Louis and surrounding communities.  SLMPD officers responded to several protests in military-like tactical dress with helmets, batons, and full-body riot shields.  They carried chemical agents including tear gas, skunk, inert smoke, pepper gas, pepper pellets, xylyl bromide, and other similar substances.  This response differed from SLMPD's appearance at other un-permitted protests where police officers themselves were not the subject of the protest, including an anti-Donald Trump march on November 13, 2016, the St. Louis Women's March on January 21, 2017, the St. Louis LGBTQIA March and Rally on February 22, 2017, and the St. Louis March for Science on April 22, 2017.[2]

Plaintiff alleges that the protests over Mr. Stockley's acquittal ("the Stockley protests"), the vast majority of protestors and protest activity were non-violent and confined to peaceful marching and chanting.  At the following times and locations, SLMPD officers deployed chemical agents without warning against individuals who were observing, recording, or participating in the protest activity:

a.  September 15, near the intersection of Clark and Tucker Avenues;

b.  September 15, near the intersection of McPherson and Euclid Avenues;

c.  September 15, near the intersection of Waterman and Kingshighway Boulevards;

d.  September 15, near the intersection of Lindell and Euclid Avenues;

e.  September 15, near the intersection of Euclid and Maryland Avenues;

f.  September 15, near the intersection of Lindell and Kingshighway Boulevards;

g.  September 15, near the intersection of Euclid Avenue and Pershing Place;

h.  September 15, on Hortense Place;

i.  September 17, near the intersection of Tucker Boulevard and Washington Avenue; and

j.  September 29, outside of Busch Stadium.  (Doc. 104 at ¶ 28.)

Before the Stockley protests, in October 2014, SLMPD officers fired chemical agents at protestors on south Grand Avenue.  In November 2014, officers again fired chemical agents at

---

[2] Hereinafter, all dates refer to 2017 unless otherwise indicated.

protestors on South Grand as well as into a business where peaceful protestors had congregated. SLMPD officers refused to allow the protestors to leave.

In December 2014, a judge of this Court issued a temporary restraining order ("TRO") enjoining the SLMPD from enforcing any rule, policy, or practice that grants law enforcement officials the authority or discretion to use chemical agents to disperse groups who are engaged in peaceful, non-criminal activity without first issuing clear warnings that chemical agents will be used, providing individuals sufficient opportunity to exit the area, minimizing the impact of the chemical agents on those complying with law enforcement commands, and ensuring there is a means of safe egress from the area. The Court also enjoined the SLMPD from using chemical agents on individuals engaged in peaceful, non-criminal activity for the purpose of frightening or punishing the individuals for exercising their constitutional rights. *Templeton v. Dotson*, No. 4:14 CV 2019, 2014 WL 13650910 at *3 (E.D. Mo. Dec. 11, 2014).

In 2015, the City of St. Louis ("the City") entered into a settlement agreement in that case agreeing to the same terms as the TRO with the exception that the SLMPD does not need to follow these rules when a situation turns violent, persons at the scene present an imminent threat of bodily harm to persons or damage to property, or when law enforcement officials must defend themselves or other persons or property against that imminent threat. *Id.*, 2015 WL 13650910 at *1-2.

Plaintiff alleges in the instant case that less than two months after entering into this settlement, the SLMPD began to violate the agreement. On May 19, 2015, SLMPD officers used chemical agents, without warning, against peaceful, non-criminal protestors who were protesting the St. Louis Circuit Attorney's office's refusal to charge an SLMPD officer for killing an African American man. On August 19, 2015, a protest took place after SLMPD officers killed an African American man in the Fountain Park neighborhood. Officers indiscriminately used chemical agents without giving an audible and intelligible warning at the intersection of Walton Avenue and Page Boulevard. Plaintiff alleges an identified witness testified officers fired chemical agents at her without giving her an opportunity to leave. Officers continued to fire chemical agents at people fleeing the area and fired them at people peacefully standing on their own properties. Thirty minutes after the protests ended, SLMPD officers returned and fired chemical agents at this witness while she was standing on her own property.

On July 21, 2017, SLMPD officers used chemical agents against individuals protesting the treatment of detainees in the St. Louis Medium Security Jail. Although a few individuals did

engage in unlawful activity earlier in the night, SLMPD officers pepper sprayed many individuals who were not involved in criminal activity or who were not at the same location as the criminal activity.

According to testimony Police Sgt. Rossomanno gave in a federal court hearing, on September 17, between 8:00 p.m. and 9:00 p.m., a handful of individuals broke windows and destroyed flowerpots on the 900-1100 blocks of Olive Street in downtown St. Louis. SLMPD officers arrested several individuals for this conduct. There is no evidence plaintiff Ortega was in any way involved in the destruction of property.

Plaintiff alleges that defendant Lt. Col. Leyshock was the incident commander directing all of the supervisors, including the other named defendants. Lt. Sachs was in direct command of the officers in tactical gear. At approximately 8:48 p.m., a small number of protestors were ordered to disperse and were told they could "be subject to arrest and/or chemical munitions." A second dispersal order was given at 8:51 p.m. Plaintiff Ortega was not present for either of these orders. Sgts. Rossomanno and Jemerson directed people to the intersection of Washington Avenue and Tucker Boulevard (hereinafter "Washington and Tucker"), where defendants had already decided they would kettle, pepper spray, beat, and arrest Ortega and others. These dispersal orders could not be heard or understood by other police officers, much less by civilians. Lt. Sachs testified in federal court that he heard some sort of order being given, but he could not make out "exactly what was being said."

Over the next two or more hours, SLMPD officers began blocking roads and directing civilians to Washington and Tucker. After speaking to Lts. Boyher, Major Howard relayed information to Lt. Col. Leyshock. Lt. Sachs created a plan to arrest everyone present. He presented the plan to Lt. Col. Leyshock who approved it. The plan was to not let anyone leave that was in the vicinity of Washington and Tucker. Sgt. Karnowski, and the officers under his command, began to push the protestors north towards Washington and Tucker. He testified that he determined the protest that evening was an unlawful assembly.

Plaintiff Ortega alleges Lt. Col. Leyshock, Lt. Sachs, and Sgts. Rossomanno and Jemerson knew or should have known that this plan to kettle people and arrest them, merely for being present, would result in arrests without probable cause and the unjustified use of force to effectuate those arrests. The area includes many condominiums, apartment buildings, and businesses, including restaurants and bars. Around 11:15 p.m., SLMPD officers began forming into lines.

This was nearly three hours after the windows and flowerpots were broken, and many blocks away from the damaged businesses.  The SLMPD's Civil Disobedience Team appeared at the scene.

Plaintiff alleges that a line of officers extended across the street and sidewalk on Washington one block west of Tucker.  Another line of officers extended across the street and sidewalk on Tucker one block north of Washington.  A third line of officers extended across the street and sidewalk on Tucker one block south of Washington.  All three lines of officers wore military-like tactical dress, including helmets.  They carried long wooden batons and full-body riot shields.  A fourth line of officers extended across the street and sidewalk on Washington one half block east of Tucker.  The four lines began to approach Washington and Tucker.

Plaintiff alleges that without instruction or warning, officers surrounded residents, business patrons, protestors, observers, and members of the press, cutting off all exits, and preventing the people inside the area from leaving.  As they approached, officers began banging batons against their riot shields and the street.  Citizens approached officers and asked to be let past.  Officers responded by screaming, "Get back!"  The officers trapped everyone who was within a one-block radius of Washington and Tucker.  This is a tactic known as "kettling."  Officers kettled a wide variety of innocent citizens, including self-admitted protestors, residents who live in the area, people visiting businesses, reporters, documentarians, and homeless persons.  The officers even grabbed an African American male who was outside of the kettle and threw him into the kettle.

Individuals in the kettle approached the line of bicycle officers with their hands up.  The bicycle officers jabbed at the individuals, using their bicycles as battering rams.  Some supervisors, including Sgt. Karnowski and Lt. Kiphart, used pepper spray against peaceful citizens who were complying with police orders, to the extent any orders were given.  Their actions caused plaintiff Ortega to be very fearful.

At the start of the kettle, a few people in the crowd peacefully stood with their hands up in front of the officers.  Sgt. Karnowski used pepper spray against them.  At no time was Sgt. Karnowski in any danger because he was standing safely with a line of bicycle officers between him and the citizens.  All of his actions were documented on a video camera strapped to his helmet.  Sgt. Karnowski's actions gave tacit approval to other officers to engage in the same behavior.  This created a domino effect of the use of force on Ortega and others arrested that evening.

Almost instantly after being pepper sprayed, individuals in the kettle put their hands in the air as a sign of peaceful surrender.  Many laid prostrate on the ground.  Others sat down.  Those

6

who could not sit down, because of how many people were inside the kettle, got as close to the ground as possible.  Video evidence shows none of the individuals inside the kettle acted violently or aggressively, and yet, officers repeatedly doused them with chemical agents without warning. Lt. Kiphart attacked a journalist holding a camera with pepper spray from a "fogger" which he also sprayed indiscriminately into the crowd.  Moments later, Officer Burle deployed another fogger blast towards the same journalist and those sitting near him, hitting the journalist in the face with pepper spray.

Plaintiff alleges that many of the persons later arrested were kicked, beaten, and dragged. Some individuals were wearing goggles because they feared the deployment of chemical agents, based on the SLMPD's prior behavior against peaceful protestors.  Others found paper masks on the ground, or other objects, to protect themselves.  Officers roughly removed the goggles of some individuals and sprayed them directly in the face.  Some officers screamed derogatory and homophobic epithets at individuals as they were being arrested.

Sgts. Jemerson and Rossomanno, and other supervisors, were within arms-length of officers pepper spraying and beating peaceful and compliant citizens.  Rather than instructing those officers to stop, they took control of the situation and directed the officers' actions.  Officers used hard, plastic zip ties to arrest all of the individuals.  Months later, individuals continued to suffer from pain and numbness in their hands due to the tightness of the zip ties.  Over 100 people were arrested that night.  During and after the arrests, officers were observed high-fiving each other, smoking celebratory cigars, taking selfies on their personal phones with arrestees against the arrestees' wills, and chanting, "Whose Streets? Our Streets!"  An anonymous person posted a celebratory photo of police officers on Twitter that night.

Plaintiff alleges that the coordinated actions of the officers in circling the individuals into the kettle and the systematic disbursement of chemical agents made clear that these tactics were planned and that senior SLMPD officials had notice of and sanctioned the conduct of defendants. Defendants' actions did not occur randomly.  They decided beforehand that they would make an example of the arrestees in an attempt to scare other citizens from exercising their First Amendment rights to protest the SLMPD's actions.  Officers hid their identities from observers and citizen arrestees, including plaintiff Ortega, by obscuring their identities and intentionally failing to record which officers seized or interacted with each arrestee.  They did so to scare and intimidate observers, terrorize the citizen arrestees, avoid any department accountability, avoid

any civil or criminal legal responsibility, and to help fellow officers avoid identifying wrongdoers following the incidents.

The next day, Lt. Col. O'Toole, the SLMPD Acting Chief, reinforced the City's ratification of the defendants' actions when he said, "I'm proud to say the City of St. Louis and the police owned the night," while standing next to St. Louis Mayor Lyda Krewson.  Mayor Krewson further validated the defendants' actions when she thanked the officers "for the outstanding job they have been doing over the last three days."  She added that she fully supported the actions of the officers.

After the arrests, the United States Attorney's Office brought indictments in federal court against five SLMPD officers for the beating of an undercover police officer on September 17.  Emails quoted in the indictment show that the officers were informed ahead of time that they would be deployed wearing military-like tactical dress to conceal their identities in order to beat protestors.  Plaintiff alleges this is what occurred to him, under the direct supervision and control of Lt. Col. Leyshock, Lts. Boyher and Sachs, and Sgts. Jemerson, Karnowski, and Rossomanno.  The indictment quoted text messages between officers about the mass arrest on September 17.

The SLMPD and the City's Correctional Staff failed and/or refused to follow its own policy regarding prisoner medical care when they did not provide any medical care to any of the people pepper sprayed and arrested.  At no time between their arrest and release, did any police officer, or other city official, provide an arrestee with medical care, or give them anything to wash the chemical agents out of their eyes, or off their bodies or clothes.

Upon their release, the arrestees were given summonses stating that they had been charged with "failure to disperse."  The summonses instructed them to appear at St. Louis City Municipal Court on October 18, 2017.  They were charged even though officers provided no way to leave, denied repeated requests to be allowed to leave, and kettled the individuals.  In at least one case, SLMPD officers threw a person from outside the kettle, into the kettle, and then arrested the person for failure to disperse.  The SLMPD's press release stated, "[m]any of the demonstrators were peaceful, however after dark, the agitators outnumbered the peaceful demonstrators and the unruly crowd became a mob.  Multiple businesses also sustained property damage and one officer suffered a serious injury."  The SLMPD failed to mention in its press release that the "one officer who suffered a serious injury" was an undercover officer who was pepper sprayed and beaten by fellow SLMPD officers.  The SLMPD also publicly released the addresses of the arrestees.  As Judge Perry observed after a preliminary injunction hearing in *Ahmad v. St. Louis*, No. 4:17 CV 2455,

8

concerning the same kettling event, the video evidence "shows no credible threat of force or violence to officers or property in this mixed commercial and residential area."

On October 13, the City Counselor's office issued a letter to arrestees stating, "[a]s of today, the City Counselor is still reviewing the evidence against you in order to decide whether or not to file charges and it is not anticipated that this decision will be made prior to October 18, 2017.  Therefore, you are released from any obligation to appear in Municipal Court on October 18, 2017, in connection with the offense being considered.  After a review of the matter is completed, should a decision be made to file charges against you, you will be notified by mail of that decision and advised when and where to appear to defend against those charges."

On November 15, in *Ahmad v. St. Louis,* No. 4:17 CV 2455, Judge Perry barred the SLMPD from using many of the tactics described in the instant complaint.  Judge Perry found that "[p]rotest activity began shortly after the announcement of the verdict on the morning of September 15.  Protestors assembled in front of the state courthouse downtown near Tucker and Market streets.  They did not have a permit to protest because the City of St. Louis does not require, and will not provide, a permit for protests."  Judge Perry further found that on September 17, there was some property damage downtown, but Lt. Sachs "testified that he was unaware of any property damage occurring in the downtown area after 8:30 p.m."  Judge Perry then found that Sgt. Rossomanno gave a dispersal order before 10:00 p.m., but "this order did not specify how far protestors had to go to comply with the directive to leave the area."  Judge Perry noted that Lt. Sachs "could not say 'exactly how far would be enough' to comply with this, or any, dispersal order."

Judge Perry also stated Lt. Sachs "testified that around 10:00 p.m. the decision was made to make a mass arrest of people remaining in the area of Tucker and Washington, which is three to four blocks away from where the earlier dispersal order was given."  Yet, the SLMPD continued to "freely allow[] people ingress into the area after the initial dispersal order was given."  The last known dispersal order was given approximately 45 minutes before the mass arrests began, but approximately 45 minutes after the SLMPD made the decision to conduct a mass arrest.  This final dispersal order was given approximately two blocks south of Washington and Tucker.  The order was, "You are being ordered to disperse from the area of Locust and Tucker by walking north on Tucker or west on Locust."  By complying with the order and moving north on Tucker, as directed, citizens were forced to the intersection of Washington and Tucker, which SLMPD had designated

9

as the mass arrest location.  Even though citizens complied with the order, officers arrested them for failure to comply.

Judge Perry found that at 11:30 p.m., the SLMPD began a mass arrest even though video evidence presented to the Court "does not show a large crowd congregating in the streets" and "[n]o violent activity by protestors can be observed on the video."  The "scene appears calm and most people appear relaxed."  The only signs of disobedience are "four to five individuals" sitting on Tucker, which was closed, and a small group of people yelling at the police.  The video was taken from approximately 10:45 p.m. until the time of the arrests at 11:30 p.m.  The video "shows an unidentified officer walking around with a hand-held fogger shooting pepper spray at the arrestees, who all appear to be on the ground and complying with police commands.  This officer issues no verbal commands to any arrestee, and no arrestee on the video appears to be resisting arrest.  The video shows other officers shouting at people on the ground and making threatening gestures at them with mace.  An unidentified (person) lying face down on the ground is picked up by his feet by two officers and dragged across the pavement."  Judge Perry made a series of findings of fact and conclusions of law in support of the preliminary injunction in Case No. 4:17 CV 2455, at Doc. 58., pgs. 36-45.

Plaintiff alleges senior officials of the SLMPD, including defendants Leyshock, Boyher, Sachs, Jemerson, Karnowski, and Rossomanno, directed such actions and conduct and/or tacitly accepted and encouraged such conduct by not preventing officers from engaging in such conduct and by not disciplining them when they engaged in such conduct.  At no point since the mass arrest has the SLMPD Internal Affairs Division done an internal investigation of any kind into the numerous citizen complaints filed following the kettling incident.

On September 17, plaintiff Ortega decided to observe one of the many protests following the Stockley verdict.  Ortega and his colleague, Dillan Newbold, arrived downtown around 10:30 p.m.  They approached the intersection of Tucker and Locust, hoping to see the protests.  However, the protests had largely dispersed by that time.  Plaintiff Ortega observed a small group of people walking toward the area near Washington and Tucker, so he followed them.  He did not hear any dispersal orders.

At the intersection, at approximately 11:15 p.m., plaintiff Ortega noticed that officers on bicycles in the area began to chant while organizing and forming a line east of the crowd on Washington.  Seeing this, Ortega and Newbold attempted to leave the area, walking south on

Tucker, and turning west on St. Charles Street.  As they walked, they saw officers beating civilians with batons and spraying them with chemical agents.  Ortega and Newbold emerged from St. Charles onto Washington and found there was no exit from the perimeter of officers encircling Washington and Tucker.  They were surrounded by rows of officers.

Officers in three of the rows wore riot gear, including helmets, shields, and batons.  One officer directed plaintiff Ortega and Mr. Newbold east, toward the row of officers carrying bicycles.  They went towards the officers thinking it was toward the exit.  The officers aggressively pushed their bicycles at them, instead of letting them leave.  Mr. Newbold attempted to record the officers.  He was wearing goggles and an officer pulled them off his face and then pepper sprayed him.  Plaintiff Ortega heard Mr. Newbold tell the officer he could not do this and that he, Mr. Newbold, knew his rights.  Two additional officers then grabbed Mr. Newbold.  Ortega watched the officers pepper spray Newbold and throw him to the ground.  Plaintiff Ortega attempted to record as well, but was unable to do so.

Plaintiff Ortega alleges he heard an officer yell to Newbold, "Don't touch your fucking phone!"  Lt. Kiphart then sprayed plaintiff Ortega with pepper spray.  Ortega lay on his stomach, writhing in pain, when he was ordered to put his hands up.  He rose to a kneeling position to comply, and Officer Burle immediately pepper sprayed him again.  Ortega covered his face with his hat and lay back on the ground.  At least fifteen people around him suffered the same treatment.  While on the ground, Officer Thacker told plaintiff Ortega to roll onto his stomach.  As he went to do so, Officer Thacker kicked Ortega in his left ribs.  Plaintiff Ortega felt a sharp pain in the center of his back as Officer Thacker forcefully jammed a knee and pushed all of his weight into Ortega's back while applying extremely tight, painful zip ties to his wrists.

An unidentified officer pulled plaintiff Ortega up by his tied wrists, causing excruciating pain in both of his shoulders, neck, and lower back.  A different unidentified officer ignored Ortega's complaint that the zip ties were causing intense pain, moved Ortega from the intersection, and told him to sit down along a wall with other arrestees.  No one assisted Ortega in getting to the ground safely, and he landed forcefully.  Officer Walsh, plaintiff Ortega's arresting officer, tightened the zip cuffs more after Ortega complained of pain.  Due to prior surgeries on Ortega's left wrist, the zip ties caused severe pain and lasting damage.

At approximately 12:30 a.m., plaintiff Ortega boarded a bus, along with other detainees, and officers shuttled him to the Justice Center.  Due to the number of individuals in the holding

11

cell, any movement caused Ortega and the others in the cell to tear up anew, from the overwhelming pepper spray still on their bodies and clothing.  In the holding cell, plaintiff Ortega was unable to sleep.  He was zip tied for several hours there, further exacerbating his wrist, shoulder, and back injuries, and his emotional trauma.

## II.    STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss all or part of a complaint for its failure to state a claim upon which relief can be granted.  To overcome a motion to dismiss under Rule 12(b)(6) a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  To meet the plausibility standard, the complaint must contain "more than labels and conclusions." *Id.* at 555. Such a complaint will "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and will state a claim for relief that rises above mere speculation.  *Twombly*, 550 U.S. at 555.

In reviewing the pleadings under this standard, the Court must accept all of plaintiff's factual allegations as true and draw all inferences in the plaintiff's favor, but the Court is not required to accept the legal conclusions the plaintiff draws from the facts alleged.  *Retro Television Network, Inc. v. Luken Commc'ns, LLC,* 696 F.3d 766, 768-69 (8th Cir. 2012).  The Court additionally "is not required to divine the litigant's intent and create claims that are not clearly raised, . . . and it need not conjure up unpled allegations to save a complaint." *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 473 (8th Cir. 2009) (en banc) (citations omitted).

## III.    DISCUSSION

Defendants assert several arguments in support of their motion to dismiss.  They claim they are entitled to qualified immunity on plaintiff Ortega's § 1983 claims under the First and Fourth Amendments, that the § 1983 civil conspiracy claim is barred by the intracorporate conspiracy doctrine, that the state law claims are barred by official immunity or are insufficient as a matter of law, and that the *Monell* claim against the City fails to allege an unconstitutional custom. Defendants also ask the Court to decline supplemental jurisdiction over plaintiff's claim under the City's Charter.  Before addressing the parties' substantive arguments, the Court must first address defendants' request that the Court consider exhibits attached to plaintiff's prior complaints.

### A.      Exhibits Attached to Earlier Complaints

The Motion to Dismiss challenges plaintiff's Third Amended Complaint.  Unlike his prior complaints, plaintiff Ortega did not attach any exhibit to this complaint.  Defendants assert the Court should still consider, for the purposes of this motion, certain exhibits attached to the prior complaints, by finding them necessarily embraced by the Third Amended Complaint, or by taking judicial notice of them.   The exhibits referenced by defendants are the transcript from the preliminary injunction hearing in *Ahmad*, a declaration from Sgt. Rossomanno filed in *Ahmad*, and a video of the kettling.

The Court cannot consider the exhibits attached to the earlier complaints.  "When a plaintiff files an amended complaint, the original complaint is superseded and has no legal effect." *Thomas v. United Steelworkers Local 1938*, 743 F.3d 1134, 1139 (8th Cir. 2014); *see also Hoefling v. City of Miami*, 811 F.3d 1271, 1277 (11th Cir. 2016) ("[W]hen [plaintiff] filed the second amended complaint, the first amended complaint (and its attached exhibits) became a legal nullity.").  Plaintiff abandoned the exhibits attached to the earlier complaints by not including them in the current complaint, which does not include any exhibit.  While a court may consider documents necessarily embraced by a complaint, but not attached, it may only do so for "documents whose contents are alleged in a complaint and whose authenticity no party questions." *See Ryan v. Ryan*, 889 F.3d 499, 505 (8th Cir. 2018).  For example, the contract in a contract dispute, or an EEOC complaint in a discrimination case.  In this case, defendants ask the Court to consider alleged testimony, not written documents.  Defendants argue that the testimony is now a "document" because it is in transcript form.  Defendants do not point the Court to any authority, nor is the Court able to find any authority, saying such or allowing the Court to consider on a motion to dismiss a party's prior testimony in a separate case.

Nor will the Court take judicial notice of the content of the exhibits.  Federal Rule of Evidence 201(b) allows a court to take judicial notice of "a fact that is not subject to reasonable dispute" either because it is generally known within the court's jurisdiction or because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  The facts defendants ask the Court to take judicial notice of, such as the "crowd had disregarded repeated orders to disperse," are disputed by plaintiff, as he alleges the exact opposite in the current complaint.  While the Court could take judicial notice that a certain person testified at a court hearing, it is inappropriate for the Court to take judicial notice of the contents of a person's

testimony at a contested hearing.  The Court will not consider defendants' requested exhibits in deciding this motion to dismiss.  The Court now turns to defendants' substantive arguments.

### B.    Qualified Immunity

Defendants assert they are entitled to qualified immunity on plaintiff's § 1983 claims under the First and Fourth Amendments.  Qualified immunity protects governmental officials from civil liability if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Officials are entitled to qualified immunity unless a plaintiff can show "(1) a deprivation of a constitutional right, and (2) that the right was clearly established at the time of the deprivation." *Robbins v. City of Des Moines*, 984 F.3d 673, 678 (8th Cir. 2021).  A court may address either inquiry first.  *Id*.

"To be clearly established, the 'contours of the right must be sufficiently clear that a reasonable official would [have understood] that what he is doing violates that right."  *Quraishi v. St. Charles Cty., Mo.*, 986 F.3d 831, 835 (8th Cir. 2021) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  The law, at the time of the alleged violation, must give officials "'fair warning' their conduct was unlawful."  *Id.*  (quoting *Sisney v. Reisch*, 674 F.3d 839, 845 (8th Cir. 2012)). Although there may be the "rare obvious case" where it is clear the officer's conduct is unlawful without precedent addressing a similar circumstance, most cases will require precedent, controlling authority, or a robust consensus of cases of persuasive authority finding the conduct at issue is unconstitutional.  *Id*.

### i.    Arrest of Plaintiff Ortega

In Count 1, plaintiff Ortega alleges the defendant officers arrested him without probable cause in violation of the Fourth Amendment.  He also alleges the defendant officers' use of kettling without warning was an unreasonable seizure.  Plaintiff alleges the defendant officers violated his rights to assemble and to free speech when they kettled and arrested him.  The defendant officers argue they had probable cause to arrest plaintiff so they did not violate his constitutional rights.

"A warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause and an officer is entitled to qualified immunity if there is at least 'arguable probable cause.'"  *Ulrich v. Pope Cty.*, 715 F.3d 1054, 1059 (8th Cir. 2013) (quoting *Borgman v. Kedley*, 646 F.3d 518, 522-23 (8th Cir. 2011)).  "Probable cause exists when the totality of facts known at the time of the arrest would justify a reasonable person in believing that the individual has

committed or is committing an offense." *Hosea v. City of St. Paul*, 867 F.3d 949, 955 (8th Cir. 2017). "Arguable probable cause exists even when an officer mistakenly arrests a suspect believing the arrest is based in probable cause if the mistake is objectively reasonable." *Id*. (internal quotations omitted). A plaintiff asserting a retaliatory arrest claim under the First Amendment must plead and prove the absence of probable cause for the arrest. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1724 (2019). Thus, for his claims of unlawful seizure and retaliatory arrest, plaintiff must show the defendant officers did not have probable cause to arrest him.

While probable cause for an arrest is generally focused on the one arrestee's actions, law enforcement officers may arrest a large group of individuals if the officers have probable cause that the group is committing a crime and acting as a unit. *See Bernini v. City of St. Paul*, 665 F.3d 997 (8th Cir. 2012). In *Bernini*, during protests in St. Paul, Minnesota, there were various reports of property damage around the City. *Id*. at 1001. Consequently, after the protest permits expired, the police commander ordered that no one be allowed to enter the downtown area. *Id*. A large group attempted to move towards downtown and officers blocked them. *Id*. The officers ordered the group to back up and deployed stinger blast balls against them. *Id*. Officers reported numerous objects were thrown at them. *Id*. The crowd grew in size and started chanting in unison and yelling profanities. *Id*. The officers continued to use non-lethal munitions to keep the crowd moving away from downtown. *Id*. at 1002. Officers decided to encircle the crowd in a park. *Id*. They announced everyone was under arrest and for everyone to sit down with their hands on their heads. *Id*. The officers then attempted to determine who had been at the initial altercation and who were innocent bystanders, eventually releasing approximately 200 people and arresting around 160 others. *Id*.

The Eighth Circuit held that the officers had probable cause to conduct the mass arrest because the individuals arrested acted as a unit in committing a crime. *Id*. at 1003-04. The Eighth Circuit found the officers could have reasonably concluded that the group had committed a crime and were acting as a unit because the individuals donned gas masks and other facial coverings, flags waved from within the crowd, several people shouted profanities and taunted the officers, members shielded themselves behind two large signs, and members chanted in unison. *Id*. at 1003-04. The Eighth Circuit also noted that the officers did not arrest everyone but attempted to discern who had been a part of the initial altercation where the unlawful activity had occurred and who had not, releasing approximately 200 people. *Id*. at 1005.

In its opinion, the Eighth Circuit relied on *Carr v. District of Columbia*, 587 F.3d 401 (D.C. Cir. 2009).  In *Carr*, the D.C. Circuit held that "[a] requirement that the officers verify [] each and every member of a crowd engaged in a specific riotous act would be practically impossible in any situation involving a large riot, particularly when it is on the move – at night."  *Id*.  Therefore, to conduct a mass arrest, and to not have to show particularized probable cause that each individual arrested violated the law, the police must show the crowd acted unlawfully as a unit.  *Id*.

In this case, the defendant officers assert they had probable cause to conduct a mass arrest of the group for peace disturbance, unlawful assembly, or refusal to disperse.  As it relates to this case, in Missouri, a person commits the offense of peace disturbance if he:

> (2) Is in a public place or on private property of another without consent and purposely causes inconvenience to another person or persons by unreasonably and physically obstructing:

> (a) Vehicular or pedestrian traffic; or

> (b) The free ingress or egress to or from a public or private place.

Mo. Rev. Stat. § 574.010 (eff. Jan. 1, 2017).  A person commits the offense of unlawful assembly if he "knowingly assembles with six or more other persons and agrees with such persons to violate any of the criminal laws of this state or of the United States with force or violence."  Mo. Rev. Stat. § 574.040 (eff. Jan. 1, 2017).  A person commits the offense of refusal to disperse "if, being present at the scene of an unlawful assembly, or at the scene of a riot, he or she knowingly fails or refuses to obey the lawful command of a law enforcement officer to depart from the scene of such unlawful assembly or riot."  Mo. Rev. Stat. § 574.060 (eff. Jan. 1, 2017).

Two other cases from this Court have addressed the mass arrest that occurred on September 17.  The defendant officers ask the Court to follow the holding in *Burbridge v. City of St. Louis, Missouri*, 430 F. Supp. 3d 595 (E.D. Mo. 2019), which found that officers had probable cause to conduct the mass arrest.  In *Burbridge*, Judge Clark found the officers had grounds to believe the plaintiffs were part of a unit observed violating the law.  430 F. Supp. 3d at 610.  He found that officers declared the area an unlawful assembly, issued multiple dispersal orders to the crowd, and then arrested those who refused to follow the lawful commands of the officers.  *Id*.

The procedural posture of *Burbridge* differs significantly from this case.  Judge Clark decided a motion for summary judgment with proffered evidence.  *Id*. at 604-08.  In this case, the Court must accept as true, and may only consider, plaintiff's allegations in his Third Amended

Complaint.  In *Burbridge*, the undisputed facts included individuals throwing rocks and other objects at officers, and the officers giving dispersal orders through a public address system.  *Id*. at 605.  The Third Amended Complaint does not include any such allegations.

The factual allegations in this case more closely align with those in *Baude v.  City of St. Louis*, 476 F. Supp. 3d 900 (E.D. Mo. 2020).  The events in *Baude* concern the same night in question, September 17, and the same alleged kettling event.  *Id*. at 907.  The plaintiff heard about the Stockley protests and decided to act as a neutral observer, documenting protest activity.  *Id*. When he arrived at the intersection of Tucker and Locust, police officers ordered everyone to leave by walking north on Tucker.  *Id*.  The plaintiff obeyed and headed towards Washington.  *Id*. Individuals from shops, restaurants, and residential buildings joined the crowd.  *Id*.  Officers gave no further dispersal orders or other instructions and started confining everyone to the intersection of Washington and Tucker.  *Id*.  The plaintiff asked an officer where he should go and the officer said it was too late to leave.  *Id*.  He then asked another officer if he could help, and the officer pushed him back into the intersection.  *Id*. at 908.  The plaintiff was then sprayed with pepper spray, arrested, zip-tied, and lined up against a building.  *Id*.

Judge Sippel, on a motion for judgment on the pleadings, found these allegations sufficient to preclude qualified immunity on the plaintiff's unlawful seizure claims.  *Id*. at 910.  He stated, "Plaintiff's allegations of what occurred at the Washington and Tucker intersection on September 17, 2017, do not establish that the officers in this case could reasonably have concluded the group at the intersection was acting as a unit or violating the law."  *Id*.  He further held the allegations showed no credible threat of force or violence to officers or property, there were no reports of property damage after 8:30 p.m., and the scene was relatively calm.  *Id*.

Similarly, in this case, there are no allegations the crowd acted as a unit.  There are no allegations that the group chanted in unison, moved as a group, carried signs together, or in any way acted as if they were a unit.  While some vandalism did occur hours before the mass arrest, officers ordered that group to disperse and there are no allegations that they did not, that they continued to vandalize property, or that they moved as a group towards Tucker and Washington. It is not reasonable to assume the group of individuals arrested in mass are the same group that engaged in the earlier vandalism when the area includes many businesses, including shops and restaurants, as well as residential buildings and the mass arrest occurred two to three hours after the vandalism occurred.

17

Nor are there any allegations to support that those in the group arrested committed any crimes.  Plaintiff alleges those arrested stood still, with their hands up.  No one acted violently or aggressively and many asked to be allowed to leave, peacefully.  The scene was relatively calm before the officers began using chemical agents and deploying force against the group.  The allegations show no credible threat of force or violence to officers or property, or that any individuals were disobeying police orders.  Plaintiff's allegations do not establish that the officers in this case could reasonably have concluded that the group was acting as a unit or violating the law.  Under these alleged facts, the defendant officers could be found to have violated the Fourth Amendment by arresting plaintiff, and others, without probable cause.

The defendant officers also argue they are entitled to qualified immunity because it was not clearly established that they could not conduct a mass arrest of a crowd violating traffic laws and unlawfully assembling.  In 2012, *Bernini* clearly established that to conduct a mass arrest there must be probable cause that the group is committing a crime and acting as a unit.  665 F.3d at 1003-04.  The facts in *Bernini* are not dissimilar to the general situation presented in this case.  However, unlike in *Bernini*, where the crowd chanted together, carried signs together, and waved flags together, there are no factual allegations in this case to support the defendant officers' contention the group was acting as a unit, or that officers could perceive them to be doing so.  Nor is it alleged that any of the officers in this case attempted to determine which individuals were part of a unit acting unlawfully and which were swept up incidentally, as the officers did in *Bernini*.  Because plaintiff's allegations did not indicate the defendant officers had probable cause to arrest plaintiff, and it was clearly established at the time of the mass arrest on September 17, 2017, that to conduct a mass arrest, officers must have probable cause the group is committing a crime and acting as a unit, they are not entitled to qualified immunity.

Defendants also argue that the generic allegations found in paragraphs 10, and 12-17 are not sufficient to establish the supervisory officers are liable for Counts 1 and 2.  Paragraphs 10 and 12-17 of the Third Amended Complaint describe who the parties are in the action.  Those allegations alone are not enough to establish a defendant's liability.  However, the remainder of the complaint includes specific allegations that individual defendants participated in an unlawful arrest of plaintiff.  These allegations include that Sgts. Rossomanno, Karnowski and Jemerson directed individuals towards Washington and Tucker.  (Doc. 104, ¶¶ 49, 53).  They observed officers pepper spraying and arresting individuals and directed those officers' actions.  *Id*. at ¶ 94.

18

Lt. Sachs devised the plan of the mass arrest, Lt. Col. Leyshock approved the plan, and Major Howard, Lt. Boyher, and Lt. Col. Leyshock put it in action. *Id*. at 52, 53, 55. These are sufficient, specific allegations to establish these defendants participated in plaintiff's allegedly unlawful arrest.

Lt. Col. O'Toole, named in paragraph 10, is not named as a defendant in Count 1 or 2 of the Third Amended Complaint. Counts 1 and 2 are against "Defendant Officers." (Doc. 104, pgs. 33, 34). The complaint defines "Defendant Officers" as the individuals listed in paragraphs 12-20. Those paragraphs do not include defendant Lt. Col. O'Toole.

Finally, defendants argue Lt. Boyher, Sgts. Karnowski, Jemerson, and Rossomanno, and the "other defendants" acted on the orders of their superiors, which is entirely reasonable, so they are entitled to qualified immunity. The Eighth Circuit has held that it can be objectively reasonable for one officer to rely on an assurance of probable cause from another officer. *See Bell v. Neukirch*, 979 F.3d 594, 609 (8th Cir. 2020); *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1010 (8th Cir. 2017). However, that reliance must be reasonable. *Bell*, 979 F.3d at 609; *Ehlers*, 846 F.3d at 1010. Based on the allegations in the complaint, it would not be reasonable for these officers to rely on the assurance of their superiors that the crowd was not disbursing. The allegations indicate the officers saw the group acting peacefully, obeying orders, and not committing a crime. Furthermore, an individual officer is not entitled to qualified immunity just because his superior told him to engage in unconstitutional conduct. *See Quraishi v. St. Charles Cty., Mo.*, 986 F.3d 831, 837 (8th Cir. 2021) ("Anderson is not entitled to qualified immunity even if his sergeant told him to deploy the tear-gas."). There is no legal support for the proposition that "a government official is immune if a superior instructs him to engage in unconstitutional conduct." *Id*. The defendants are not entitled to qualified immunity simply because they followed orders. The Court denies the motion to dismiss Counts 1 and 2.

### ii. Excessive Force

In Count 12, plaintiff Ortega asserts a claim under § 1983 for a violation of his right to be free from excessive force under the Fourth Amendment. He alleges the defendant officers used excessive force against him when they pepper sprayed him multiple times, kettled him, tied his hands too tightly with zip ties, kicked him in the ribs, and pulled him up by his tied hands. Defendants argue that plaintiff does not allege the supervisory officers knew other officers were using excessive force, and if they did know, it was reasonable for them to believe it was necessary.

They also argue it was not clearly established that the use of pepper spray, tight handcuffing, arm twisting, or the brief dragging of an arrestee constitutes anything more than *de minimis* use of force.  Thus, they argue they are entitled to qualified immunity.

"To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, the test is whether the amount of force used was objectively reasonable under the particular circumstances."  *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009).  The Court considers the claim from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id*.  "Circumstances relevant to the reasonableness of the officer's conduct include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id*.

"Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment."  *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal citations and quotations omitted).  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."  *Id*. at 396-97.  "[F]orce is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public."  *Brown*, 574 F.3d at 499.

Plaintiff alleges that as he attempted to record the kettling, Lt. Kiphart told him not to touch his phone and then sprayed him with pepper spray.  As plaintiff lay on the ground in pain, on his stomach, he was ordered to put his hands up.  When he got to his knees to comply, Officer Burle immediately pepper sprayed him again.  He covered his face and lay back down.  Officer Thacker told him to roll over, then kicked plaintiff in the ribs.  Officer Thacker then jammed his knee into his back, put all of his weight onto plaintiff's back, and applied extremely tight zip ties to his wrists.  Another officer then pulled plaintiff up by his wrists, causing excruciating pain in his shoulders, neck, and lower back.  After plaintiff complained about the zip ties, Officer Walsh tightened them more.

Before addressing the specific uses of force, the Court must first address defendants' argument that none of the alleged uses of force against plaintiff constitute Fourth Amendment violations because they resulted in no more than *de minimis* injury to plaintiff.  Since 2011, the

Eighth Circuit has made it clear that a *de minimis* injury does not preclude a Fourth Amendment violation. *Chambers v. Pennycock*, 641 F.3d 898, 906 (8th Cir. 2011); *Robinson v. Hawkins*, 937 F.3d 1128, 1136 (8th Cir. 2019) ("While a *de minimis* injury does not preclude a claim of excessive force. . ."). The appropriate inquiry is the nature of the force applied, not the degree of injury inflicted. *Chambers*, 641 F.3d at 906. Defendants' argument is unavailing.

Viewing the facts in the light most favorable to plaintiff, the use of pepper spray against him was not objectively reasonable. *See Quraishi*, 986 F.3d at 840 (8th Cir. 2021) (The use of pepper spray to arrest an unarmed, compliant suspect can be excessive force). The alleged crimes officers were detaining him for were non-violent misdemeanors. There is no indication he was fleeing or resisting arrest, that he posed an immediate threat to the officers' safety, or that he disobeyed any officer's commands. Similarly, under plaintiff's allegations it was not objectively reasonable for Officer Thacker to kick plaintiff in the ribs when he was attempting to comply with Officer Thacker's order to roll over. *See Blazek v. City of Iowa, City*, 761 F.3d 920, 925 (8th Cir. 2014) ("A gratuitous and completely unnecessary act of violence is unreasonable and violates the Fourth Amendment."). It also was not objectively reasonable for officers to jerk plaintiff up by his wrists when he was not resisting, posed no threat to officers, and was not suspected of any serious offense. *See id.* Plaintiff alleges that these uses of force caused him lasting injury, including injuries to his wrist, shoulder, and back.

The kettling, forcing plaintiff along with other individuals into a single area and not allowing them to leave, did not involve an objectively unreasonable use of force against plaintiff. Based on the facts alleged in the Third Amended Complaint, officers did not use any force in the act of kettling Plaintiff. The alleged use of force came after he had been trapped in the intersection and was being placed under arrest. Therefore, the defendant officers are entitled to qualified immunity on Count 12 as it relates solely to the act of kettling plaintiff.

Plaintiff has also not established that officers applying zip ties too tightly violates the Constitution. The Eighth Circuit previously found that an officer who applies handcuffs so tightly they break a suspect's wrist uses excessive force in violation of the Fourth Amendment. *Kukla v. Hulm*, 310 F.3d 1046, 1050 (8th Cir. 2002). It has not been clearly established that anything less than this constitutes excessive force. Here, plaintiff alleges the zip ties were causing him intense pain and he informed the officers, but they only tightened them more. He asserts the zip ties caused severe pain because he had previously undergone surgeries on his left wrist. These allegations do

21

not rise to the level of force established in *Kukla*, where the suspect's wrist was broken from the handcuffs.  Furthermore, the Court considers the claim from the "perspective of a reasonable officer on the scene," and a reasonable officer would not have known plaintiff had prior wrist injuries which would result in zip ties causing undue pain.  Because it was not clearly established that applying zip ties too tightly violates the Fourth Amendment, the defendant officers are entitled to qualified immunity on this portion of plaintiff's claim.

Defendants also argue it is not clearly established that the other alleged uses of force were unconstitutional.  In May 2017, the Eighth Circuit established that it is unreasonable to use pepper spray against a non-resisting, non-fleeing individual, suspected of a non-violent misdemeanor. *Tatum v. Robinson*, 858 F.3d 544, 548-550 (8th Cir. 2017).  In *Blazek*, the Eighth Circuit established it was excessive force to jerk an individual up by his arms with sufficient force to cause an injury to the individual's shoulder when the individual was not resisting arrest, posed no threat to officers, was not suspected of a serious offense, and was handcuffed and under control.  761 F.3d at 925.  The Eighth Circuit has also previously established officers use an objectively unreasonable amount of force when they kick and punch an individual who is handcuffed and no longer resisting. *White v. Jackson*, 865 F.3d 1064, 1080 (8th Cir. 2017) (citing *Krout v. Goemmer*, 583 F.3d 557, 566 (8th Cir. 2009)).  Even though plaintiff was not handcuffed at the time Officer Thacker kicked him, he was laying on the ground, attempting to comply with Officer Thacker's orders.  He was not resisting arrest.  At the time the defendant officers used force against plaintiff by pepper spraying him, kicking him, and jerking him up in such a forceful manner it has caused lasting damage to his shoulders and back, it was clearly established their actions would violate the Fourth Amendment.  The defendant officers are not entitled to qualified immunity, on the motion to dismiss the complaint, on Count 12 as it relates to plaintiff being pepper sprayed, kicked in the ribs, and jerked up by his wrists.

Defendants argue the supervisory defendants who did not personally pepper spray or kick plaintiff cannot be liable for the alleged uses of excessive force.  Officers who do not directly use excessive force, but fail to intervene to prevent the use of excessive force by another officer, may be liable for violating the Fourth Amendment. *Nance v. Sammis*, 586 F.3d 604, 611-12 (8th Cir. 2009).  As Judge Sippel found in *Baude*, at this stage of litigation, plaintiff only needs to allege facts sufficient to state a plausible claim for liability.  476 F. Supp. 3d at 914.  Plaintiff Ortega alleges the supervisory defendants were present at the mass arrest, witnessed officers using

22

excessive force, and failed to intervene.  He also alleges the supervisory defendants issued orders allowing the use of force against a non-violent, largely compliant crowd.  These allegations are sufficient to state a claim against the supervisory defendants.  *See Wagner v. Jones*, 664 F.3d 259, 275 (8th Cir. 2011) ("The supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he or she] might see.").  In *Nance*, the Eighth Circuit held that, as of June 2007, it was clearly established that "an officer who fails to intervene to prevent the unconstitutional use of excessive force by another officer may be held liable for violating the Fourth Amendment."  *Id*.  Consequently, the supervisory defendants are not entitled to qualified immunity on Count 12.

### C.    Conspiracy

In Count 3, plaintiff asserts a § 1983 civil conspiracy claim against the defendant officers and Lt. Col. O'Toole.  Defendants ask the Court to apply the intracorporate conspiracy doctrine or, in the alternative, find defendants are entitled to qualified immunity because it is not clearly established that the intracorporate conspiracy doctrine does not apply.  The intracorporate conspiracy doctrine provides that "a local government entity cannot conspire with itself through its agents acting within the scope of their employment." *Kelley v. City of Omaha, Neb.*, 813 F.3d 1070, 1078 (8th Cir. 2016) (quoting *L.L. Nelson Enters., Inc. v. City of St. Louis, Mo.*, 673 F.3d 799, 812 (8th Cir. 2012)).  The Eighth Circuit has only applied the doctrine to 42 U.S.C. § 1985 claims; it has not yet determined if it applies to § 1983 claims.  This district has generally declined to apply the doctrine at the motion to dismiss stage.  *See e.g., Newbold v. City of St. Louis*, No. 4:18 CV 1572 HEA, 2019 WL 3220405, at *6 (E.D. Mo. Jul. 16, 2019) (collecting cases).  Most recently, the undersigned declined to apply it at the pleading stage in the absence of direction from the Eighth Circuit.  *Torres v. City of St. Louis*, No. 4:19 CV 1525 DDN, 2021 WL 1143909 at *8 (E.D. Mo. Mar. 25, 2021).  The Court again declines to apply the doctrine for the same reason.

In *Baude*, Judge Sippel held the defendants were entitled to qualified immunity on the § 1983 civil conspiracy claim because the law is unsettled as to whether or not the intracorporate conspiracy doctrine applies.  476 F. Supp. 3d at 916.  The Court respectfully declines to apply the holding of *Baude* in this regard, and instead finds more persuasive the holding in *Street v. O'Toole*, No. 4:19 CV 2590 CDP, 2021 WL 677909 at *8 (E.D. Mo. Feb. 22, 2021) (Perry, J.).  In *Street*, Judge Perry rejected the argument that the law regarding the intracorporate conspiracy doctrine is not clearly established.  2021 WL 677909 at *8.  Judge Perry found that the Eighth Circuit has

23

clearly established that police officers from the same department may be liable for conspiring to violate clearly established constitutional rights because the Eighth Circuit has consistently recognized § 1983 civil conspiracy claims in prior cases. *Id.* (citing *Small v. McCrystal*, 708 F.3d 997, 1010 (8th Cir. 2013); *S.L. ex rel. Lenderman v. St. Louis Metro. Police Dep't Bd. of Police Comm'rs*, 725 F.3d 843, 852-54 (8th Cir. 2013)). The undersigned agrees with Judge Perry that "on September 17, 2017, a reasonable SLMPD officer would have known that he or she could be subjected to § 1983 conspiracy liability by conspiring with other SLMPD officers to violate plaintiffs' clearly established constitutional rights." *Id*. Therefore, defendants are not entitled to qualified immunity on plaintiff's § 1983 claim by virtue of the intracorporate conspiracy doctrine.

> **D.     Monell[3] Claim**

In Count 4, plaintiff asserts a claim against the City under § 1983 for the City's unconstitutional customs and alleged failures to train, discipline, and supervise officers on the use of force and kettling. Specifically, plaintiff alleges the SLMPD's policies, practices, or customs that caused constitutional harm to him include: (1) officers' routine use of excessive force when policing protests, especially those at which police brutality is being protested; (2) the SLMPD's refusal to provide medical care to citizens arrested including those suffering from pepper spray, and its refusal to loosen or release dangerously tight zip cuffs and treat resulting injuries; (3) kettling without warning on citizens who are not resisting arrest and are exercising their First Amendment rights; (4) use of vague and contradictory dispersal orders without giving an opportunity to comply; (5) arbitrary declaration of unlawful assemblies in the absence of any threat of force or violent activity; and (6) violation of the Fourth Amendment by regularly conducting unreasonable seizures and arresting individuals without probable cause. (Doc. 104, pgs. 38-39).

"Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an official municipal policy, (2) an unofficial custom; or (3) a deliberately indifferent failure to train or supervise." *Mick v. Raines*, 883 F.3d 1075, 1079 (8th Cir. 2018) (internal quotations omitted). The City argues plaintiff fails to establish *Monell* liability under any of the asserted theories.

---

[3] In *Monell*, the Supreme Court held that a government, under color of an official policy, is liable where it "'causes' an employee to violate another's constitutional rights." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978).

i.   **Custom or Practice**

To establish liability for a municipality's alleged custom, a plaintiff must allege: "(1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the [municipality's] employees; (2) deliberate indifference to or tacit authorization of such conduct by the [municipality's] policymaking officials after notice to the officials of that misconduct;" and (3) the custom was the moving force behind the constitutional violation. *Ware v. Jackson Cty., Mo.*, 150 F.3d 873, 880 (8th Cir. 1998). As other judges of this Court have held with respect to similar *Monell* allegations in related cases, plaintiff's Third Amended Complaint plausibly alleges that SLMPD customs on the use of excessive force against protestors, the use of vague and contradictory dispersal orders, the arbitrary declaration of unlawful assemblies, and the unreasonable seizures and arrests of protestors without probable cause were the moving force behind the constitutional violation he suffered. *See Street*, 2021 WL 677909 at *12; *Baude v. City of St. Louis*, No. 4:18 CV 1564 RWS, 2019 WL 4750254 at *5 (E.D. Mo. Sept. 30, 2019); *Rose v. City of St. Louis, Mo.*, No. 4:18 CV 1568 RLW, 2019 WL 4602829 at *5 (E.D. Mo. Sept. 23, 2019); *Thomas v. City of St. Louis, Mo.*, No. 4:18 CV 1566 JAR, 2019 WL 3037200 at *6 (E.D. Mo. July 11, 2019); *Laird v. City of St. Louis, Mo.*, No. 4:18 CV 1567 AGF, 2019 WL 2647273 at *5 (E.D. Mo. June 27, 2019); *Laney v. City of St. Louis, Mo.*, No. 4:18 CV 1575 CDP, 2019 WL 2423308 at *4-5 (E.D. Mo. June 10, 2019); *Aldridge v. City of St. Louis, Mo.*, No. 4:18 CV 1677 CAS, 2019 WL 1695982 at *10-11 (E.D. Mo. Apr. 17, 2019).

Specifically, plaintiff alleges a pattern of using chemical agents without warning against peaceful protestors complaining of police actions, including incidents in October and November 2014, in May and August 2015, and in July 2017; as well as additional incidents that occurred after the *Stockley* verdict on September 15, 2017. Plaintiff Ortega further alleges the City had notice of the past unconstitutional conduct because it entered into a settlement agreement in March 2015 in *Templeton, et al. v. Dotson, et al.,* No. 4:14 CV 2019 CEJ (E.D. Mo.), in which it agreed not to use chemical agents to disperse groups of individuals engaged in non-criminal activity without first issuing clear and unambiguous warnings that such chemical agents would be used and without ensuring that there is a means of safe egress from the area (among other protections). However, after the consent decree was entered, SLMPD officers continued to use chemical agents against non-violent protestors without adequate warning or opportunity to comply. These factual

allegations are sufficient to support the existence of an unconstitutional policy or custom that plausibly caused the constitutional violations alleged here.

However, plaintiff does not sufficiently allege a pattern of the SLMPD's failure to provide medical care to protestors, the use of too tight of zip ties and the refusal to loosen those zip ties, or SLMPD's kettling of protestors without warning.  For each of these, plaintiff only alleges the events that occurred on September 17.  He does not allege any prior incidents to support such customs.  Thus, he has not established a pattern of unconstitutional misconduct as it concerns those alleged customs.  The Court grants the motion to dismiss as to those alleged customs only.

### ii.     Failure to Train or Supervise

To allege a § 1983 claim against the City for a failure to train or supervise, plaintiff must plead facts sufficient to show the City's training and supervision practices were inadequate, the City was deliberately indifferent to the rights of others in adopting these practices, the City's failure to train and supervise was the result of deliberate and conscious choices, and the alleged deficiencies caused plaintiff's constitutional deprivation.  *Ulrich v. Pope Cty.*, 715 F.3d 1054, 1061 (8th Cir. 2013); *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1216 (8th Cir. 2013).

Although several judges in this Court have found allegations of the City's failure to train or supervise to be deficient, the allegations in this case align more closely with Judge Perry's decision in *Street*.  In that case Judge Perry stated:

> Plaintiffs again point to the *Templeton* settlement agreement, which memorialized several changes to the SLMPD's use of force and supervision procedures in order to prevent future constitutional injury.  Plaintiffs allege that SLMPD officers were not trained in procedures necessary to comply with the settlement agreement.  Plaintiffs further allege facts which demonstrate that even after the *Templeton* consent decree, SLMPD officers repeatedly used excessive force against protestors in a similar manner as was challenged in *Templeton*.  From these facts, a plausible inference could be drawn that the City failed to train and supervise its officers in proper use of force procedures, that said failure was the result of a conscious and deliberate choice, and that the failure to train resulted in their constitutional injuries.

2021 WL 677909 at *13.  Plaintiff makes the same allegations in his Third Amended Complaint.  Therefore, the undersigned agrees with Judge Perry that from these allegations, a plausible inference can be drawn that the City failed to train or supervise its officers.  The Court denies the motion to dismiss as to plaintiff's claims the City failed to train or supervise its officers.

26

### E.      State Law Claims

Defendants assert all of plaintiff's state law claims either are barred by official immunity or fail as a matter of law.

#### i.      Official Immunity

"Under Missouri law, public officials acting within the scope of their authority are not liable in tort for injuries arising from their discretionary acts or omissions." *Davis v. White*, 794 F.3d 1008, 1013 (8th Cir. 2015). Official immunity only protects officials who act within the course of their official duties and without malice. *State ex rel. Alsup v. Kanatzar*, 588 S.W.3d 187, 190 (Mo. 2019). "A defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." *Id.* at 190, n. 7. "[A] police officer's decision to use force in the performance of his duties is discretionary." *Davis*, 794 F.3d at 1013.

The acts alleged in plaintiff's Third Amended Complaint are discretionary and thus, defendants may be entitled to official immunity. However, plaintiff's allegations are insufficient to allege defendants did not act with malice. The allegedly unnecessary use of force against non-resisting individuals, such as plaintiff, the inflammatory and disparaging remarks made by SLMPD officers before, during, and after the incident, and the comparison between SLMPD's response to the Stockley protests and other protests not related to police misconduct may reasonably support a finding of malice or bad faith. *See Street*, 2021 WL 677909 at *10. Official immunity is not appropriate at this stage of the litigation.

#### ii.      False Arrest

Defendants assert plaintiff's false arrest claim should be dismissed for the same reasons they should be granted qualified immunity for the § 1983 unlawful arrest claim, citing *Edwards v. McNeill*, 894 S.W.2d 678 (Mo. Ct. App. 1995) in support. *Edwards* provides that justification is a complete defense to a cause of action for false arrest. *Id.* at 683. Because plaintiff's allegations do not establish the defendants acted with probable cause to arrest plaintiff, the Court denies the motion to dismiss the claim for false arrest.

#### iii.      Abuse of Process, Malicious Prosecution

In Counts 7 and 8, plaintiff asserts claims of abuse of process and malicious prosecution against the defendant officers and Lt. Col. O'Toole. To assert a claim of malicious prosecution, a plaintiff must establish: "(1) the commencement of a prosecution against the plaintiff, (2) the

27

instigation of that prosecution by the defendant, (3) the termination of the proceeding in favor of the plaintiff, (4) the want of probable cause for the prosecution, (5) that defendant's conduct was actuated by malice, and (6) damage to the plaintiff." *Baker v. St. Joe Minerals Corp.*, 744 S.W.2d 887, 888 (Mo. Ct. App. 1988).  Instigation requires affirmative action either through advice, encouragement, pressure, or something similar. *Id*. at 889.  "The providing of honest information" does not constitute instigation, although supplying false information may. *Id*.  To establish a claim for abuse of process, a plaintiff must show: "(1) the present defendant made an illegal, improper, perverted use of process, a use neither warranted nor authorized by the process; (2) the defendant had an improper purpose in exercising such illegal, perverted or improper use of process; and (3) damage resulted." *Trustees of Clayton Terrace Subdivision v. 6 Clayton Terrace, LLC*, 585 S.W.3d 269, 277 (Mo. 2019) (quoting *Ritterbusch v. Holt*, 789 S.W.2d 491, 493 (Mo. 1990)).  Both malicious prosecution and abuse of process require a legal process be initiated. *Id*.; *Baker*, 744 S.W.2d at 888.

Here, the Third Amended Complaint contains only two factual allegations related to either of these claims.  One is that all of the arrestees were given summonses showing they had been charged with "failure to disperse" and instructing them to appear in St. Louis Municipal Court on October 18, 2017.  (Doc. 104, at ¶ 110).  The second is that on October 13, 2017, the City Counselor's office sent another letter saying it is reviewing the evidence in order to decide whether or not to file charges and the arrestee has no obligation to appear in Municipal Court on October 18, 2017.  (Doc. 104, at ¶ 118).  There are no allegations that plaintiff was charged with a crime, nor are there any allegations about who instigated the issuance of the initial summons.  While plaintiff alleges defendants arrested him, he does not allege those same officers were involved in issuing the summons.  Consequently, he does not allege sufficient facts to state a claim for abuse of process or for malicious prosecution.  Therefore, the Court dismisses Counts 7 and 8. *See Street*, 2021 WL 677909 at *10 (dismissing claims of malicious prosecution and abuse of process because plaintiffs did not allege any facts showing any defendant had a role in the initiation of any proceedings against the plaintiffs).

### iv. Intentional and Negligent Infliction of Emotional Distress

Plaintiff alleges a claim for intentional infliction of emotional distress in Count 9 and negligent infliction of emotional distress in Count 10 against the defendant officers.  Defendants assert that the Court must dismiss these counts because they are "simply repackaged claims of

assault or battery," citing to *State ex rel. Halsey v. Phillips*, 576 S.W.3d 177 (Mo. 2019).  (Doc. 107, pg. 14).  The Missouri Supreme Court, in *Halsey*, recited the general rule that "[w]here a defendant's conduct amounts to the commission of one of the traditional torts . . . and the conduct was not intended only to cause extreme emotional distress to the victim, the tort of intentional emotional distress will not lie, and recovery must be had under the appropriate traditional common-law action."  576 S.W.3d at 181 (quoting *K.G. v. R.T.R.*, 918 S.W.2d 795, at 799 (Mo. 1996)).  This rule only applies to the tort of intentional infliction of emotional distress, not negligent infliction of emotional distress.  *Id*.  Thus, plaintiff's claim of negligent infliction of emotional distress may proceed.  *See Street*, 2021 WL 677909 at *11 ("[P]laintiffs only allege a negligent infliction claim so *K.G.* and *Halsey*, do not bar this claim.").

However, the Court need not dismiss plaintiff's intentional infliction of emotional distress claim either.  While he cannot proceed to judgment on all of his claims for assault, battery, and intentional infliction of emotional distress when they are all based on the same underlying conduct, at this stage of the case, he may assert alternative theories of recovery.  *See* Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency.").  Therefore, at this point, the Court does not dismiss the claim of intentional infliction of emotional distress with the understanding that at some point, plaintiff must choose between his competing claims.

### F.    Vicarious Liability under the City's Charter

In Count 11, plaintiff asserts a novel theory of liability.  He alleges Lt. Col. O'Toole and Charlene Deeken are vicariously liable under the City's Charter.  According to plaintiff, Article VIII, Section 5 of the Charter states, "[e]ach head of a department, officer or division shall be responsible for the acts or omissions of officers and employees appointed by him, and may require bonds or other securities from them to secure himself."  (Doc. 104, at ¶ 258).  Plaintiff alleges Lt. Col. O'Toole and Deeken were officers and employees of the Chief of Police and were acting in the scope of their employment when they committed the acts alleged in the Third Amended Complaint.  *Id*. at ¶¶ 259, 260.  Defendants ask the Court to decline supplemental jurisdiction for the same reasons Judge Perry did in *Street*.

In *Street*, Judge Perry declined to assert supplemental jurisdiction over the plaintiffs' claim under the City Charter, the same claim asserted in this action, because it raised novel and complex issues.  2021 WL 677909 at *13.  For example, Judge Perry stated that the claim raises statutory

construction issues, conflict-of-law questions, the intent of St. Louis officials who drafted Section 5 in 1914, the contours of Missouri law regarding officials' vicarious liability, the extent Section 5 conflicts with Missouri law, whether Missouri law preempts the Charter, and the effects of preemption on the validity of the Charter.  *Id*. at 14.  Judge Perry believed these issues were more appropriately resolved by Missouri state courts.  *Id*.

The undersigned agrees with Judge Perry.  This is already a complex case involving many legal and factual issues.  Plaintiff asks the Court to also address a novel theory of liability that is in itself very complex and has never been addressed by any prior court.  Under 28 U.S.C. § 1367(c)(1), the Court may decline supplemental jurisdiction over a claim that raises a novel or complex issue of State law.  The Court here exercises its discretion and declines to consider plaintiff's Count 11 claim of vicarious liability under the City Charter.

Accordingly,

**IT IS HEREBY ORDERED** that the motion of defendants to dismiss (Doc. 106) **is sustained as to:**

(a)     the Count 4 claim against the defendant City of St. Louis for a pattern or practice of the SLMPD's failure to provide medical care to protestors, the use of too tight zip ties and the refusal to loosen those zip ties, and SLMPD's kettling of protestors without warning;

(b)     the Count 7 claim of abuse of process;

(c)     the Count 8 claim of malicious prosecution;

(d)     the Count 11 claim of vicarious liability under the Charter of the City of St. Louis; and

(e)     the Count 12 claim against the defendant officers as it relates to the alleged act of kettling plaintiff and to the alleged act of applying the zip ties on him too tightly.

In all other respects the motion to dismiss is denied.


_____/s/   **David D. Noce**_____
**UNITED STATES MAGISTRATE JUDGE**

Signed on August 2, 2021.